*Decision will be entered under Rule 50.*

NEMOURS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86863.    Filed August 10, 1962.

*Laurence Graves, Esq.*, for the petitioner.
*Max J. Hamburger, Esq.*, for the respondent.

586

590

598

OPINION.

RAUM, *Judge:* The nature of the controversy herein has undergone a complete change since the Commissioner initially sent a deficiency notice to petitioner. The major portion of the $745,302.63 deficiency originally determined by the Commissioner was based on the factual determination that petitioner, which filed its returns and paid its taxes as a personal holding company under the applicable revenue laws each year from 1934 through 1955, remained a personal holding company during the taxable year 1956 and was subject to the personal holding company tax. In its petition filed with this Court, petitioner alleged that the Commissioner erred in this determination. Shortly before the trial of this case the Commissioner amended his answer to the petition to allege for the first time that, in the alternative, if petitioner was not a personal holding company in 1956, then it was subject to the accumulated earnings tax for such year, and an alternative, reduced deficiency in the amount of $286,281.17 was claimed. The Commissioner's new theory was necessarily stated as an alternative contention because section 532(b)(1) of the 1954 Code[1] (as did predecessor revenue acts throughout the time petitioner was a personal holding company) provides that the accumulated earnings tax is not applicable to a personal holding company. Hence, it had to be assumed (contrary to the deficiency notice) for purposes of the accumulated earnings tax allegation that petitioner no longer remained a personal holding company in 1956. At the trial the Commissioner entirely abandoned the personal holding company issue, leaving the applicability of the accumulated earnings tax to petitioner· in 1956 the only question for decision.

As an accumulated earnings tax dispute, this case has several unusual features. First of all because this issue was raised by the

---

[1] Unless otherwise indicated, all section references hereinafter will be to the Internal Revenue Code of 1954.

Commissioner for the first time in an amended answer to the petition, under the rules of practice of this Court it is the Commissioner and not the petitioner who has the burden of proof regarding the applicability of this special tax, that is, whether petitioner in 1956 was "availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." Sec. 532(a), I.R.C. 1954. In particular, the Commissioner has the burden in respect of the question whether petitioner permitted earnings and profits to accumulate in 1956 beyond the reasonable needs of its business, a matter upon which he presumably would have the burden in these circumstances in any event since he had not sent the notification provided for in section 534. But it must be noted from the outset that section 533 [2] permits the Commissioner (even in the unusual circumstances of this case) to shift the burden of proof to petitioner on the ultimate question of the purpose of the accumulation by proving that the earnings and profits of petitioner were in fact permitted to accumulate beyond the reasonable needs of the business in 1956 or that petitioner was in fact a mere holding or investment company during the taxable year.

Aside from burden-of-proof responsibilities, there is a second unusual factor which sets this case apart from prior cases considered by this Court involving the accumulated earnings tax. This factor is the continuous history of the petitioner as a personal holding company under the revenue laws for over 20 years immediately preceding the taxable year in issue. During this period petitioner was subject to the added personal holding company tax but as already noted was not also subject to the accumulated earnings tax. Thus, the petitioner's business history during the years prior to the taxable year in controversy, a matter generally of considerable importance in an accumulated earnings tax case, is of limited relevance in the instant case. As a personal holding company from 1934 through 1955, for example, petitioner's dividend policy of gearing its distributions to the tax bracket of its shareholders and its loan policy of advancing in excess of $2,500,000 to its principal shareholders on personal loans without interest cannot be viewed in the same light for purposes of decision of the present issue as if petitioner had been other than a personal holding company during this period and had experienced a

---

[2] SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

(b) HOLDING OR INVESTMENT COMPANY.—The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders.

similar history. While at the Commissioner's request we have made extended findings of fact concerning the petitioner's business and financial history while it remained a personal holding company, we think such findings are of limited usefulness except as a general background to petitioner's changed status during the taxable year in issue.

We do not mean to imply that petitioner's former status as a personal holding company in any sense exempts petitioner from the application of the accumulated earnings tax after it no longer comes within the statutory definition of a personal holding company. On the contrary, in the framework of the 1954 Code both the accumulated earnings and personal holding company taxes are contained within subchapter G which is entitled "Corporations Used to Avoid Income Tax on Shareholders," and thus petitioner's extended history as a personal holding company, if anything, makes it suspect in terms of other means, such as accumulating surplus, for avoiding shareholder taxes. We do think, however, in fairness to petitioner that while the corporation was paying its taxes as a personal holding company, petitioner and especially petitioner's principal shareholders, the Deans, had the right to treat and use the corporation as a personal holding company for all purposes and that petitioner's conduct during this period (when the accumulated earnings tax did not apply) should not necessarily prejudice its position once it becomes an ordinary operating corporation under the revenue laws.

We turn then to the issue of the applicability of the accumulated earnings tax to petitioner in 1956. After carefully studying all of the evidence of record and the arguments of counsel, we have concluded that petitioner in 1956 was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being distributed and that, therefore, it is subject to the accumulated earnings tax imposed by section 531.

Although the question is not free from doubt, we have made a finding that petitioner was not a "mere holding or investment company" (as the phrase is used in section 533(b), *supra*) as of December 31, 1956. We think that petitioner's purchase of working interests in 18 gas condensate wells in 1956 constitutes sufficient nonholding or noninvestment company activity to take petitioner out of the "mere holding or investment company" category as used in the statute and the applicable regulations. Sec. 1.533-1(c), Income Tax Regs. In this regard, we reject the Commissioner's argument on brief that petitioner's purchase of oil and gas interests in 1956, because "for the admitted specific purpose of removing petitioner from a personal holding company classification, is incompatible with business status and is legally inadequate to remove petitioner from a holding and

investment company status." By conceding that petitioner was no longer a personal holding company in 1956, the Commissioner has recognized the validity of the oil and gas interest purchases. We therefore find it difficult to follow the Commissioner's reasoning that such investments (for whatever purpose) were something less than they purported to be. To be sure, petitioner's working interests in gas condensate wells in 1956 were managed and operated by its agent, Hudson Gas and Oil Company. However, we think this agency arrangement and the gradual takeover of operations by petitioner were consistent with prudent business practice and in no way detract from petitioner's actual entry into the gas condensate business in the taxable year. We think that the scope of this business [3] was of such magnitude that petitioner cannot properly be described as a mere holding or investment company as of the close of the taxable year.[4]

As noted above in our discussion of the burden of proof, section 533(a) provides that the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be considered determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. We think on the record before us that the Commissioner has successfully proved that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of the business (including the reasonably anticipated needs of the business as provided in section 537) and that the petitioner has failed to offer a preponderance of evidence to show that such accumulation was not for the interdicted purpose of avoiding shareholder taxes.

As of the start of the taxable year 1956, the parties have stipulated that petitioner's adjusted accumulated earnings and profits amounted to $1,088,950.15. The Commissioner has argued that no further accumulations were necessary for petitioner's business needs in 1956. The petitioner has tried to show that such needs justified the retention of the additional $537,918.72 earnings and profits which it is agreed were accumulated during the taxable year. We think that the Commissioner has proved his case.

[3] The Commissioner relies on language in *John Provence #1 Well*, 37 T.C. 376, on appeal (C.A. 3), to argue that petitioner's working interests in the wells represented mere investments and not business activities. However, the working interests sold in that case, unlike those purchased by petitioner, did not include any managerial rights. Since the absence of a transfer of managerial functions was an important factor in reaching the conclusion that the working interests in *Provence* were akin to corporate stock, we think that case is distinguishable.

[4] Petitioner does not argue that its purchase of an oil production payment in 1956 constituted sufficient business activity to remove it from the "mere holding or investment company" category, and therefore we express no opinion on the question whether this phase of petitioner's total activities constituted anything more than an investment or holding of property for the production of income.

In 1956 petitioner's chief income-producing asset continued to be its 33,300 shares of Delaware Realty and Investment Company stock.[5] While its dividend income from such stock in 1956 was slightly less than it had been in 1955, still such income alone, amounting to $1,273,725, was nearly sufficient to pay all of petitioner's operating expenses during the taxable year.[6] In addition, petitioner received over $1 million in gross income from the oil and gas interests it acquired in 1956. By removing itself from the personal holding company classification, petitioner eliminated a Federal income tax expense of in excess of $800,000 in 1956. Thus, although petitioner's net income before taxes in 1956 was almost $150,000 under what it had been in 1955, its net income after taxes was $1,021,492.36 in 1956 as compared to $761,405.70 in 1955. As a result, petitioner's earnings per share after taxes increased from $21.04 in 1955 to $28.24 in 1956.

From these facts it is difficult to understand why, when petitioner was able to pay a dividend of $19.35 per share in 1955, it paid only $2 per share with increased net earnings in 1956. The answer of petitioner's president, J. Simpson Dean, in testimony at the trial was that petitioner's indebtedness incurred in connection with the purchase of its working interests in gas wells, together with its indebtedness on demand notes to the Wilmington Trust Company, was of such magnitude in relation to its cash position at the end of 1956 that a $2 dividend was determined to be all that was "reasonably safe" in the circumstances. If petitioner in fact had no choice but to pay any dividend declared in 1956 in cash, such reasoning might perhaps[7] be persuasive. However, this was not the case. Petitioner held non-interest-bearing notes in the total amount of $2,563,098.07 from its principal stockholders, the Deans, and in these circumstances a siz-

---

[5] The Delaware Realty and Investment Company stock was carried on petitioner's books at a cost value of $33,333.33, or approximately $1 a share. We think it clear on this record that the fair market value of such stock was substantially higher. Moreover, we are not at all persuaded by Dean's testimony that "Delaware Realty and Investment Company [stock] had no market, and I have my own ideas about what it would have sold for in a free market if you were ready to sell it to a willing buyer." Such testimony is equally consistent with a deliberate determination by the owners of such stock to keep it off the market and we are by no means convinced that if any such stock were offered for sale there would be any real difficulty in disposing of it at a fair price. In view of the fact, as shown by the evidence, that Delaware Realty's income stemmed largely from its extensive holdings of stock in E. I. duPont de Nemours and Company (partly owned directly and partly through holdings in Christiana Securities Company, which in turn owned large amounts of duPont stock), we have little doubt that a ready market for Delaware Realty stock could be found if only the effort were made. In regard to the actual value of this stock, it is noteworthy that shares of Delaware Realty were given a value ranging from $884.81 to $1,330 per share for collateral purposes in 1956 by institutions which held such stock as security for loans made to petitioner.

[6] Petitioner's total operating expenses in 1956, including a depletion allowance for its newly acquired gas and oil interests in the amount of $882,398.05, amounted to $1,293,-787.68.

[7] We use the qualifying word "perhaps," because the record strongly indicates that, at least as to petitioner's indebtedness in respect of its oil and gas interests, it was anticipated that such indebtedness would be paid off out of the oil and gas revenues and that no cash accumulation of current earnings was necessary for that purpose.

able dividend might have been declared by discharging a substantial portion of these notes without reducing the corporation's cash or general quick assets position.

At the trial when petitioner's counsel asked J. Simpson Dean whether such a method of paying a noncash dividend had been considered in 1956, his answer was as follows:

> You could not give much consideration to that because if Mrs. Dean and I had gotten let's say a dividend not in cash from Nemours, we could not get the money to pay the tax on what we got. So it, it could be thought of, but not actually considered. It was not practical or feasible.

Such an answer, obviously given in complete candor, furnishes no basis to the corporation for retaining earnings. The inconvenience of a noncash dividend to shareholders, while admittedly a matter of practical concern to the shareholders, can hardly justify a corporation which has more than sufficient accumulated earnings and profits but relatively little cash (in relation to its business needs) from declaring an appropriate dividend in terms of its current earnings. Certainly the cash requirements of the shareholders do not constitute a "business need" of the corporation insofar as the retention of earnings under the statute is concerned. Dean's answer to petitioner's counsel's question can only be viewed as a frank admission that no corporate business reason existed for not paying a dividend in 1956 in the notes of the principal shareholders and that the true reason for not following such a course was to avoid the resulting tax on the shareholders.

In *Whitney Chain & Mfg. Co.*, 3 T.C. 1109, affirmed per curiam 149 F. 2d 936 (C.A. 2), a similar situation existed. In that case, a major portion of the corporation's assets was tied up in corporate stock for which there was no ready market and in the form of non-interest-bearing loans to shareholders.[8] The corporation in that case was considering expanding, and it argued that its lack of quick assets fully justified the accumulations involved. This Court's answer to such argument is particularly relevant here (3 T.C. at 1119):

> We think these contentions would acquire force if, in fact there was no way to liquidate the assets. However, there is a ready answer to both of these propositions, which might be expected to have occurred to a directorate of the caliber of petitioner's. If the $70,000 retained by the petitioner was, in fact, needed in the business, a complete distribution could have been made on the condition that the stockholders apply the amount of the distribution to the reduction of their indebtedness; or a dividend in kind, payable by the cancellation of the debts of

---

[8] While on brief petitioner argues that similarly there was no market in 1956 for its Delaware Realty and Investment Company stock, we do not accept petitioner's contention in this regard nor the corollary contention that such stock did not have a fair market value. See footnote 5, *supra*. In addition, in *Whitney Chain* the major portion of the non-interest-bearing notes had benefited a predecessor in interest of the then present shareholders who had assumed the debts involved. In the instant case all of such loans were made directly to the present principal shareholders, the Deans. As a result, the facts in these key respects in the present case are not as strong for petitioner as they were in *Whitney Chain*.

the stockholders to the extent of the $70,000 retained; or a dividend payable in the stock of Hanson-Whitney might have been made, to the extent of the earnings retained. Had any one of these courses been pursued, the petitioner would have been in no worse position, as regards the financing of the proposed expansion, and yet would have avoided any further accumulation of earnings.

Moreover, in *Whitney Chain*, this Court concluded that a predominantly independent board of directors could not have been ignorant of the ready means available by which a dividend might have been paid and that the board's failure to follow such a course was indicative of a purpose to reduce the surtax burden of the shareholders. In the present case, where petitioner's board of directors was made up of and controlled by the very shareholders (the Deans) who received the tax benefits of a minimum dividend, the same conclusion follows with even greater force. Cf. *Kerr-Cochran, Inc.* v. *Commissioner*, 253 F. 2d 121, 128 (C.A. 8), affirming a Memorandum Opinion of this Court.

Apart from petitioner's cash position at the end of 1956, the only other reason suggested for petitioner's failure to distribute its current earnings was that petitioner intended to expand its oil and gas activities and in fact did expand such interests in subsequent years and that such expansion plans constituted a reasonable need of the business in 1956 (or, at least, a reasonably anticipated need of the business in such year) for which an accumulation of earnings was required. While there is some indication in the record that Dean, as petitioner's president, did consider the possibility of causing petitioner to acquire other oil and gas properties subsequent to 1956, it appears that no plans were made along such lines during the taxable year. The testimony that we heard showed that petitioner's officers in 1956 were concerned mainly with obtaining sufficient gross income from oil and gas sources to remove petitioner from the personal holding company classification in that year and in subsequent years, and that expansion beyond this goal—while it may possibly have been in Dean's mind—was vague and indefinite. Such nebulous expansion "plans" do not justify the retention of earnings by petitioner over and above the earnings already accumulated prior to the taxable year. Cf. *Barrow Manufacturing Company* v. *Commissioner*, 294 F. 2d 79, 80-81 (C.A. 5), affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 817; *American Metal Products Corporation* v. *Commissioner*, 287 F. 2d 860, 864–865 (C.A. 8), affirming 34 T.C. 89; *Dixie, Inc.* v. *Commissioner*, 277 F. 2d 526 (C.A. 2), affirming 31 T.C. 415, certiorari denied 364 U.S. 827; *I. A. Dress Co.* v. *Commissioner*, 273 F. 2d 543 (C.A. 2), affirming 32 T.C. 93, certiorari denied 362 U.S. 976; *Smoot Sand & Gravel Corp.* v. *Commissioner*, 241 F. 2d 197, 202 (C.A. 4), reversing on other grounds a Memorandum Opinion of this Court, certiorari denied 354 U.S. 922. Moreover, it must be recalled that the oil and gas interests acquired in 1956 were obtained with borrowed funds

rather than out of petitioner's own assets, and it seems plain that any possible future acquisitions could similarly be financed by borrowing. Indeed, the record affirmatively shows that such future purchases were in fact made primarily with borrowed funds. In our judgment, the explanation that petitioner's earnings were retained for this purpose is spurious.

We conclude, on the record as a whole, that the Commissioner has proved that the earnings and profits of petitioner in 1956 were allowed to accumulate beyond the reasonable needs of the business. Under the statute the accumulated earnings tax is thereby applicable, the petitioner having failed to prove by a preponderance of the evidence that the earnings and profits in fact accumulated in 1956 were not for the purpose of avoiding the income tax with respect to its shareholders.

*Decision will be entered under Rule 50.*